UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

       Plaintiff,

  v.                                         Case No. 08-CR-148

MARY SCHAEUBLE,

       Defendant.

**RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

### I. BACKGROUND

On May 20, 2008, a grand jury sitting in the Eastern District of Wisconsin returned a thirteen count indictment against the defendant, Mary Schaeuble ("Schaeuble"), charging her with thirteen occasions of embezzling, stealing and wilfully converting to her own use the funds of Local 20 of the United Steelworkers Union operated at Kaukauna, Wisconsin, in violation of 29 U.S.C. § 501(c). At her arraignment, Schaeuble entered a not guilty plea to all charges. Currently, a final pretrial conference is scheduled to be conducted before the Honorable William C. Griesbach on November 14, 2008, with a trial before Judge Griesbach scheduled to commence on December 1, 2008.

In accordance with the pretrial motion schedule issued at her arraignment, on June 26, 2008, Schaeuble filed a motion to suppress statements she gave to law enforcement personnel on July 10, 2007. In her motion, Schaeuble claims that at the time she gave her second statement she was in custody, yet she was not advised of her *Miranda* rights. She also claims that the second statement was not voluntarily given and was instead the product of coercion by law enforcement personnel. On August 4, 2008, an evidentiary hearing was conducted on the defendant's motion. Thereafter, the parties filed their respective briefs on the issues raised by the defendant. The defendant's motion

is now fully briefed and is ready for resolution. For the reasons which follow, it will be recommended that Schaeuble's motion to suppress statements be denied.

## II. DISCUSSION

### A. The Evidentiary Hearing

Three witnesses testified at the evidentiary hearing: Investigators Thomas Murray ("Murray") and Guy Heidenreich ("Heidenreich") of the Office of Labor Management Standards ("OLMS"), and the defendant, Mary Schaeuble. The following is a brief summary of the testimony adduced at the hearing.

On July 10, 2008, Murray and Heidenreich traveled to DePere, Wisconsin for the purpose of interviewing Schaeuble. They first went to her home. This was in the late morning or early afternoon. Schaeuble was not there, but a young man, age 25 to 30, whom the investigators assumed was her son, answered the door. He told them that Schaeuble was at work. They left their identifications and a phone number where they could be reached, asking him to have her call them. (Tr. at 7-8.)

Within the next 10 to 15 minutes, Schaeuble called the investigators. This was while they were still outside her house. During the conversation, Murray told Schaeuble that they were conducting an investigation involving Steel Workers Local 20 and that they would like to talk to her about her lost time claims. Murray asked her to meet them at the DePere City Hall/Police Station. Schaeuble agreed to do so. She requested that they meet about 30 to 45 minutes later, as she was at the doctor's office. (Tr. at 8-9.)

The investigators met Schaeuble at about 1:15 p.m. Schaeuble arrived there on her own. The interview was conducted in the police conference room, which is located immediately to the left as one enters the City Hall/Police Station, just off the lobby. If one were to proceed to the right upon

entering the building, he would go down a hallway to the city offices, i.e., city clerk and city treasurer. (Tr. at 9-10.)

The conference room was not secured. It was a large conference room. The large conference table had about 15 to 20 chairs around it. There were windows in the room, directly across from the door. There was normal lighting. The door was not locked. (Tr. at 12.) On the wall there were different patches from different police departments from around the state. But, besides that, there was nothing else in the conference room which would indicate it was a police station conference room. However, there were police squad cars parked outside the building. (Tr. at 30-31.)

During the interview, Schaeuble sat in the chair closest to the door, at the head of the table. Heidenreich sat in a chair to her left and Murray sat in a chair to her right. At no time was Schaeuble handcuffed. Investigators from OLMS do not carry handcuffs. Nor do they carry firearms. (Tr. at 13.) Indeed, Investigators for OLMS do not have arrest power. (Tr. at 11-12.) Schaeuble was told that she could leave whenever she wanted to leave. She was told that she was not under arrest. (Tr. at 36.)

No *Miranda* warnings were given to Schaeuble before the interview began. Indeed, in his career, Murray has never given *Miranda* warnings. (Tr. at 11.) This is because OLMS investigators do not have arrest power, i.e., they do not have the authority to put anyone into custody. Murray testified that he could not recall whether he told Schaeuble that he did not have the authority to take anyone into custody. (Tr. at 26.)

According to Murray, the interview of Schaeuble was reasonably cordial. (Tr. at 13.) According to Heidenreich, the tone of the interview was friendly and conversational. (Tr. at 39.) However, the investigators did challenge some of her answers. In other words, the investigators would from time to time tell her that they did not believe her; that it did not sound like she was

3

telling them the truth. But they never told Schaeuble that she had to give them a better statement. They never yelled at her. Nor did they ever threaten her. (Tr. at 39-41.)

Schaeuble never asked to leave the interview. She was also never stopped from leaving the interview. Indeed, at one point, the investigators asked her to step out into the hallway so that Murray and Heidenreich could talk. Schaeuble stepped out into the hallway and waited there for approximately 15 minutes while the investigators talked in the conference room. There was nothing preventing Schaeuble from leaving the building as she waited in the hallway. Yet, she did not leave. That said, it would have been clear to her that the interview was not completed at that point. (Tr. at 39-43.)

From time to time Schaeuble did seem to get upset and cried. But, at no time was she unable to communicate with the investigators. (Tr. at 44.)

While Schaeuble was being interviewed, she wrote notes to herself on a notepad. Neither Murray nor Heidenreich looked to see what she was writing. Heidenreich testified that Schaeuble asked if she could take notes and he did not see any reason why she couldn't. (Tr. at 56-57.) Schaeuble's notes were introduced into evidence at the evidentiary hearing as Defense Exhibit 1. (Tr. at 72.)

While she was being interviewed, Schaeuble was shown a number of documents, i.e. various union records. Schaeuble signed two written statements. The first statement was drafted by the investigators and was based on the information that Schaeuble had given them during the interview. It took about 15 minutes to draft the statement and it was during that 15 minutes that Schaeuble was asked to step out into the hallway. (Tr. at 19.) After the statement was completed, Schaeuble was asked to read it. She did so and made a few corrections to it. Based on the changes she made, it was clear that she was denying any criminal activity. She then signed the statement. This first statement

4

was introduced into evidence as Exhibit 1. The process of drafting, typing, printing and putting the written statement into final form took about 45 minutes. (Tr. at 21.)

After the first statement was signed, Heidenreich wanted to speak with Murray so they both stepped out into the hallway. Before doing so, they asked Schaeuble to stay in the room for a moment just to give them time to talk. At that time, Schaeuble did not ask to leave; nor did she attempt to leave. (Tr. at 23.)

The investigators re-entered the conference room and asked Schaeuble further questions. During the course of such questioning, Heidenreich prepared a second statement by typing it on his computer (as was the case with the first statement). In this instance, Heidenreich read the statement to Schaeuble as he was typing it to have Schaeuble verbally confirm that what he was typing was correct. After the statement was completed, Schaeuble read the statement and signed it. She made no corrections to the statement. This second statement was received into evidence as Exhibit 2. The process of taking the second statement from Schaeuble took about 45 minutes. (Tr. at 23-25.)

Schaeuble was the last witness called to testify. She testified that at the beginning of the interview she was told by the investigators that she was not under arrest. (Tr. at 61.) During the course of the interview and while she was being shown a large number of documents she asked the investigators what she needed to do in order to resolve what she was being accused of. According to Schaeuble, the investigators said that she needed to make a statement that they could take back to their boss. (Tr. at 63.) She testified that she made changes to the first statement because the investigators kept saying that she embezzled the money and filed fraudulent claims for lost time. She argued with them and kept telling them that she did not file any false claims. (Tr. at 63-64.)

After the two investigators left the room following her signing the first statement, they came back in and Heidenreich was really agitated with her. He said that they needed more than what she said in her statement to take back to their boss. He raised his voice and very sternly said that they

5

needed more than what was in the statement. The investigators told Schaeuble that they thought she was lying. (Tr. at 66.) Schaeuble testified that she felt that she was not free to leave even when she was asked to step outside the conference room. (Tr. at 68.)

Schaeuble identified Defense Exhibit 1 as the notes she made during the meeting. All of the notes were made during the meeting, with some of them having been made while she was waiting during the break between giving the first and second statement. (Tr. at 71.)

With respect to why she did not just get up and leave, the following exchange took place between Schaeuble and her attorney:

> Q. If things were as you testified, that you were becoming increasingly upset, and your testimony anyway is that the Investigators became angrier and angrier, why didn't you just stand up and say I'm leaving?
>
> A. I wanted to get it over, but I really thought that these were the steps that needed to be taken to resolve the matter.
>
> Q. Well, you say these are the steps that needed to be taken to resolve the matter, do you mean that needed legally, I guess? Or procedurally to be taken? Or something that you had no alternative but to do?
>
> A. I felt I had no alternative. I really didn't know what the proper steps were. I didn't have any idea how serious the matters were.

(Tr. at 73-74.) Schaeuble testified that she felt the statements had been coerced from her. (Tr. at 75.)

On cross-examination Schaeuble acknowledged that she went to the DePere Town Hall and Police Station on her own. She also testified that she asked the investigators whether she was under arrest and they told her that she was not under arrest. She acknowledged that they told her she could leave if she wished. She was not searched. She agreed with the description of the conference room as given by the investigators during their testimony. (Tr. at 76-78.) She also acknowledged that at one point she was asked to leave the conference room, that she walked out of the room and that she could have walked out of the building had she chosen to do so. She was never handcuffed; nor were handcuffs shown to her. No weapons were shown to her. She was also not stopped from taking

6
Case 1:08-cr-00148-WCG   Filed 09/18/08   Page 6 of 14   Document 24

notes. (Tr. at 79-80.) She read each of the statements before she signed them and was allowed to make changes to the statements. When the interview was over, she walked out of the building and went home. (Tr. at 80-82.) The total amount of time that Schaeuble spent with the investigators was approximately 4 hours. (Tr. at 70.)

**B. Analysis**

Schaeuble's motion to suppress her second statement is predicated on two propositions: (1) that she was the subject of a custodial interrogation and therefore should have been advised of her *Miranda* rights; and, (2) that her statement was not voluntarily given but was instead the product of police coercion. In my opinion, neither proposition has been shown to be true.

Under the Supreme Court's benchmark decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), a suspect must be warned of his constitutional rights before he is subjected to custodial interrogation. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 467. Because *Miranda* warnings are required to be given only to suspects who are subjected to "custodial interrogation," *Illinois v. Perkins*, 496 U.S. 292 (1990), the threshold inquiry in determining whether *Miranda* warnings are required is whether the suspect was in fact in custody. *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). The court must ask "whether there is a 'formal arrest or restraint on freedom of movement' to the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quoting *Mathiason*, 429 U.S. at 495).

Here, it is undisputed that there was no formal arrest of the defendant. Thus, the court's inquiry is limited to whether, at the time of the interrogation, the defendant was subjected to a restraint on her freedom of movement to the degree associated with a formal arrest. *United States v. Fazio*, 914 F.2d 950, 955 (7th Cir. 1990). "[T]he initial determination of custody depends on the

7

objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). In other words, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); *see also United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998) (declining to consider whether defendant's military training made him more likely to believe he was in custody, as "[t]he test is not whether the particular defendant thought he was free to go, but whether a 'reasonable person' in the circumstances would have believed so").

In *Mathiason*, an officer investigating a burglary left his card at the defendant's home, asking the defendant to contact him. The defendant called, and the officer asked him to come to the police station. The defendant went to the station, where the officer took him into an office and shut the door. The officer told the defendant he was not under arrest, but that the officer wanted to talk to him about a burglary. After a few minutes, the defendant confessed. *Mathiason*, 429 U.S. at 493. The Supreme Court held that the defendant was not in custody and thus *Miranda* warnings were not required:

> In the present case, however, there is no indication that the questioning took place in a context where [the defendant's] freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview [the defendant] did in fact leave the police station without hindrance. It is clear from these facts that [the defendant] was not in custody "or otherwise deprived of his freedom of action in any significant way."

*Mathiason*, 429 U.S. at 495 (quoting *Miranda*, 384 U.S. at 444). The Court stated that a "coercive environment," in the absence of restraint on freedom of movement, does not amount to custody:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed

8

> simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.

*Mathiason*, 429 U.S. at 495.

In *United States v. Jones*, 21 F.3d 165 (7th Cir. 1994), the Seventh Circuit held that the defendant was not subjected to custodial interrogation. There, the defendant was present in a hotel room when law enforcement conducted a reverse sting. A uniformed officer entered the hotel room with his gun drawn. The defendant was not placed under arrest, however, and another officer told the defendant that, although he was not under arrest, he wanted to speak with him. The defendant answered, "all right," and went with the officer in a squad car to the police station. The defendant was questioned in a room with the door closed but unlocked. The defendant was told he was free to leave. During the interview, the defendant made several incriminating statements and consented to the officers' search of several properties. The searches were conducted in the defendant's presence, and after the completion of the searches, the officers dropped the defendant off at his office. The reverse sting had occurred at about 9:00 p.m. in the evening; the defendant was dropped off after the searches in the early morning hours of the following day. *Jones*, 21 F.3d at 167. The Seventh Circuit held that these circumstances did not amount to custody:

> [The defendant] was not handcuffed or otherwise physically restrained and was told that he was not under arrest . . . and that he was free to leave. There is no evidence that the officers made any threatening gestures or statements, or otherwise engaged in 'strong arm tactics' justifying a belief by [the defendant] that he was in custody.

*Jones*, 21 F.3d at 170; *see also United States v. Scheets*, 188 F.3d 829, 841 (7th Cir. 1999) (discussing *Jones* with approval).

Applying the above-discussed principles to the facts in the instant case leads inescapably to the conclusion that Schaeuble was not in custody at the time she was interviewed by the investigators. First of all, she arrived at the DePere Town Hall/Police Station on her own. She was interviewed in a large, unlocked conference room. She was never restrained in any way. No

9

handcuffs were displayed to her. No firearms were ever displayed to her. She was expressly told that she was not under arrest.

To be sure, she was asked on one occasion to step out of the room and on another occasion to stay in the room while Murray and Heidenreich stepped out into the hall to talk to one another. But, it is undisputed that she was not ordered to do so. She could have left at any time, and she knew it. She stayed of her own volition because, as she testified, "I wanted to get it over, . . . I really thought that these were the steps that needed to be taken to resolve the matter." (Tr. at 73.) When the interview was over, she left the building on her own, without any hindrance, got back into her car and drove home.

In sum, during the course of the interview with Murray and Heidenreich, Schaeuble was clearly not in custody. She did not experience "a 'formal arrest or restraint on freedom of movement' to the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (internal citations omitted). Thus, it was not incumbent upon Murray and Heidenreich to advise Schaeuble of her *Miranda* rights before conducting their interview of her. Accordingly, to the extent that Schaeuble's motion to suppress statements is predicated on the proposition that she should have been given her *Miranda* rights, it is recommended that her motion to suppress be denied.

Schaeuble also argues that her second statement was not voluntarily given. More precisely, she claims that her "second statement was the product of coercion." (Def's Mot. at 3.) Once again, the record indicates otherwise.

A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *See Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986). The crucial question in determining whether a statement was given voluntarily is "whether

the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963).

Coercive police activity is a "necessary predicate" to a determination that a confession was not voluntarily made. *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990). Unless there is police conduct causally related to the confession, a confession is considered voluntary. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). The factual inquiry centers upon the conduct of law enforcement officials in creating pressure and the suspect's capacity to resist that pressure. *Mincey v. Arizona*, 437 U.S. 385, 398-401 (1978).

Courts have generally held that the following practices are insufficiently coercive to constitute a Fifth Amendment violation: (1) promises of leniency, *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990); (2) confrontation of the accused with other evidence of guilt, *Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir. 1989); and, (3) an interrogator's false or misleading statements, *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990). As the Seventh Circuit has stated, "[m]erely pointing out, what is anyway obvious, that cooperation with the police can result in a reduced sentence or other concessions down the road is not a promise and is not calculated to prevent the suspect from rationally considering whether or not to speak." *United States v. Ramirez*, 112 F.3d 849, 853 (7th Cir. 1997).

In determining voluntariness, factors which may be taken into consideration are:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (internal citations omitted).

Other factors the court commonly considers in assessing the totality of the circumstances surrounding testimonial evidence supplied by a defendant are: (1) the location of the questioning, *United States v. Buckley*, 4 F.3d 552, 560 (7th Cir. 1993); (2) whether *Miranda* warnings were given,

*Richardson v. Duckworth*, 834 F.2d 1366, 1371-72 (7th Cir. 1987); and, (3) whether the accused initiated contact with law enforcement officials, *United States v. Gentry*, 925 F.2d 186, 188 (7th Cir. 1991). An accused's experience with the criminal justice system is also a factor in the totality test. *Lord v. Duckworth*, 29 F.3d 1216, 1222 (7th Cir. 1994).

First of all, as discussed earlier, in this case both of the defendant's statements were given while she was not in custody. While there is a presumption of coercion that attends statements given during custodial interrogation in the absence of *Miranda* warnings, statements made during non-custodial interrogation are not viewed with suspicion. *United States v. Levy*, 955 F.2d 1098, 1104 (7th Cir. 1992). Furthermore, the facts adduced at the hearing demonstrate that Schaeuble's second statement was not a product of coercive police conduct. To the contrary, her second statement was a voluntary act on her part.

The setting in which Schaeuble gave the statement was hardly an oppressive environment. It was a large conference room in a public building, the door to which room was never locked. And she knew that she could leave at any time. Moreover, Schaeuble is not a person of tender years. She is a mature woman with more than 50 years of life experience and impressed this court as having plenty of intelligence. She is also not a shrinking violet. Indeed, she had the self-assurance to take her own notes during the interview. Not many interviewees have the gumption to do that. Furthermore, although the meeting with the investigators may have taken about four hours, that is not such an extensive period of time as to support a finding that her ability to resist giving a statement was worn down. In other words, this is not a case where the interviewee was so deprived of sleep and/or food that it broke her will to resist answering questions.

To be sure, Schaeuble testified that the investigators, particularly Heidenreich, were agitated with her and made clear that they did not believe her. She also testified that she occasionally wept during the course of the interview. But, that she may have wept and that she may have felt the

investigators were agitated because they did not believe her does not demonstrate that her will was overborne by them. If that were the case, virtually all statements given to government investigators would fail the voluntariness test. After all, being interviewed by any government investigator is likely an unpleasant experience for the interviewee, especially if the investigator is accusing the interviewee of dishonesty. But, unpleasantness does not amount to coerciveness, and it is only coerciveness that renders a statement involuntary.

To reiterate, a statement is voluntary if, in light of the totality of the circumstances, the statement is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will. *See Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir. 1997). Under this test, Schaeuble's second statement was clearly voluntary.

In conclusion, to the extent that Schaeuble's motion to suppress statements is predicated on the proposition that any statement she gave was involuntary, it is recommended that her motion to suppress be denied.

**NOW THEREFORE IT IS RECOMMENDED** that defendant Schaeuble's motion to suppress statements be **DENIED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) - (C), Federal Rule of Criminal Procedure 59(b)(2), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any recommendation herein or part thereof may be filed within ten days of the date of service of this recommendation. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance with the rules cited herein waives your right to review.

**SO ORDERED** this 17th day of September 2008, at Milwaukee, Wisconsin.

                                              /s/ William E. Callahan, Jr.
                                              WILLIAM E. CALLAHAN, JR.
                                              United States Magistrate Judge